**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) <br> ) <br> **Plaintiff,** ) <br> ) <br> **vs.** ) <br> ) <br> **WILLIAM HANSEN,** ) <br> ) <br> **Defendant.** ) | **8:05CR186** <br><br> **REPORT AND RECOMMENDATION** |

An evidentiary hearing was held June 2, 2005 on defendant's MOTION TO SUPPRESS EVIDENCE (#20). The transcript (#26) was filed on June 3, 2005, at which time the matter was deemed submitted.

Defendant, William Hansen, was arrested on outstanding warrants after his vehicle was stopped for a traffic violation on the night of November 20, 2004. Defendant's vehicle was searched at the scene of the traffic stop. Defendant also made statements to the arresting officer before and after being given his *Miranda*[1] rights. During oral argument, counsel clarified that the validity of the traffic stop is not contested (3:1); however, defendant does object to the admission of his post-arrest statements (3:4-7), *see Missouri v. Seibert,* 542 U.S. 600, 124 S. Ct. 2601 (2004), and continues to object to the search of his vehicle.

The government argues that defendant's vehicle was searched incident to arrest; that defendant voluntarily consented to the search and the search did not exceed the scope of the

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

consent (60:10-61:9); and that the search was a proper inventory search (61:18-62:3). The government further argues that defendant voluntarily waived his *Miranda* rights and his Mirandized statements are admissible under *United States v. Fellers*, 397 F.3d 1090 (8th Cir. 2005), and *United States v. Terry*, 400 F.3d 575 (8th Cir. 2005).

## I.  FACTUAL BACKGROUND

Buck G. Boje testified that he is a sergeant with the Nebraska State Patrol assigned to the traffic division. Boje has 15 years experience in law enforcement and has been a State Patrol sergeant for one and one-half years. His duties include traffic and criminal law enforcement. (6:16-24).

At 10:40 p.m. on November 20, 2004, Boje was on duty, in uniform, driving a marked patrol car. He conducted a traffic stop of a maroon-colored '80s model Chevy pickup at the intersection of Willow and Rodeo Road Street in North Platte, Nebraska. The vehicle was stopped for a taillight violation. (7:2-22; 28:22-23). The stop and subsequent events were recorded, and the videotape was admitted as Exhibit 1.

The sole occupant of the truck was the driver, who identified himself as William Hansen, Jr. (8: 1-4). He remained seated in the front seat of the truck while Boje asked him for his name, date of birth, a driver's license, registration and proof of insurance. (32:9-22). Defendant was about 46 years old. (13:17). He told Boje that he did not have a driver's license. Boje asked defendant as to the status of his license, that is, if he had one, or if he had left it at home. Defendant told Boje that his driver's license was under suspension. He did

produce the registration showing that he owned the vehicle, but had no proof of insurance. (9:11-10:1). Boje testified he did not see anything "of evidentiary value" in plain view during this discussion. (32:20-22). He did subsequently discover that the plates displayed did not belong on the pickup. (30:12-16).

Boje requested a check on defendant's status through dispatch. The dispatcher advised that there were two active warrants for defendant's arrest, and that defendant's driver's license was suspended and revoked. Boje was able to confirm the existence of the two warrants. (10:2-20). After receiving this information, Boje arrested defendant pursuant to the two active arrest warrants, placed defendant in handcuffs, and conducted a search of defendant's person for weapons. (10:21-24). He found no controlled substances or illegal contraband on defendant's person and placed defendant in the front passenger seat of the patrol car. Defendant remained handcuffed in the patrol car until he was transported from the scene at 12:25 a.m. (15:3; 31:14-25).

Sergeant Boje testified that, inside the patrol car, he asked defendant if he had any illegal drugs, weapons, or explosives inside the pickup. Defendant said he did not. Boje then asked if it would be all right if either he or Trooper Gina Jones, who was also present, "took a look" through the pickup. According to Boje, defendant said he did not have a problem with it, but he had called someone to come and take his pickup away and she was on her way there. Boje reassured defendant it would not take long and again asked if it would be all

right, and defendant said, "Yeah, that's fine." This conversation occurred at about 10:50 p.m. (10:25-12:12).

Boje testified he did not make any threats to get defendant to agree to the search, did not make any promises of benefits he might receive, and did not use any force or try to put defendant in fear. Defendant did not appear to be under the influence of alcohol or drugs. He appeared to know where he was, who Boje was, and what was going on. Defendant's answers were responsive and he appeared to be coherent. (12:13-13:15).

Once defendant said it was alright to search the vehicle, Boje had Trooper Jones go ahead and begin to enter the pickup to search it. (14:1-7). Boje's patrol car was situated at an angle at the rear of defendant's pickup, about 10 feet away, and the pickup could be seen from the front seat of the patrol car, where Boje and defendant were sitting. (14:11-15:6).

When Jones attempted to enter the pickup, she discovered it had no door handles or mechanism to gain entry through the doors. Defendant told Boje that, since he had already shut and locked the doors, the only way to get into the pickup was through the rear sliding window. Thus, Jones entered the pickup through the rear window. Defendant told Boje that he had several Japanese paintings in the front seat of the pickup that he did not want stepped on. Boje relayed that information to Jones. (15:8-24).

According to Sgt. Boje, Jones entered the pickup truck at about 10:53 or 10:55 p.m.[2] (16:2). Jones reported to Boje that she saw a needle syringe lying in plain view on the floorboard, partially under the driver's seat. Boje, in turn, asked defendant if he had any type of medical condition, such as diabetes, as to why the syringe was in his vehicle, and if he knew why the syringe was in his vehicle. Defendant replied that he did not have any medical condition requiring a needle and syringe, and he did not know why the needle and syringe would be there. (16:10-25).

Boje testified on cross-examination that he initially considered allowing the vehicle to be released to a third party (33:20-34:7). He learned during the course of the traffic stop that defendant had been previously charged, arrested, and convicted of several felonies, including the possession and delivery of controlled substances. (13:18-23). After the needle and syringe were found in the truck, he determined that the truck would not be released to a third party. (38:4-15).

Jones continued to search through the truck and report back to Boje. She found a plastic baggie containing a white crystalline-type substance Boje thought was "ice," or crystal methamphetamine. Boje took the plastic baggie from Jones, showed it to defendant and asked if it was, in fact, ice or methamphetamine. Defendant responded that it was. (17:8-20).

---

[2] Minor discrepancies in Boje's testimony as to specific times may be attributed to a one- to two-minute difference between the time set on the videotape and that displayed on the clock in the patrol car. (27:21-28:20).

Defendant admitted he used methamphetamine. These statements were made before defendant was given his *Miranda* rights. (41:9-42:7).

Boje acknowledged that he spoke from time to time with the defendant before giving him his *Miranda* rights, and testified that the defendant initiated some of the conversation. (20:2-4). According to Boje, it was mostly general conversation regarding defendant's identification. For purposes of officer safety, Boje had asked defendant whether there were other needles or syringes or anything that would poke or stab the officer who was searching the pickup. Boje testified he asked for other general information for safety purposes. Noting that the pickup bed held numerous tools and other items, Boje asked defendant if any of the property was stolen. (20:5-22).

Sergeant Boje testified that, during the hour that elapsed between the time the search of the truck began and the time defendant was given his *Miranda* rights, he was engaged in numerous activities. He was busy completing paperwork inside his patrol card, i.e., filling out the citation and other forms. Several people, and at least two vehicles, arrived at the scene, apparently because defendant had anticipated being arrested and made some calls on his cell phone. One person who arrived was the female who came to drive the pickup away. Boje and Jones talked to her, trying to ascertain the location of the other vehicle, which he recalled contained at least four people. Boje called for other officers because of the number of people who had come to the scene. Boje talked to them and to the dispatcher. He also conducted a field test of the white substance found in the pickup. Boje continued to interact

with Jones as she searched the truck. He eventually asked her to go ahead and begin an inventory of the vehicle. (18:3-19:16).

At 11:55 or 11:57 p.m., about the time Jones started the formal inventory search, Boje read defendant his *Miranda* rights using a Nebraska State Patrol ADVICE OF RIGHTS and WAIVER OF RIGHTS form (Ex. 2). Boje denied that he was using an interview technique or plan to gain admissions and then Mirandize the defendant and ask him the same things later. (20:23-21:5).

Boje testified he completed the information on the rights advisory form and read the form verbatim to the defendant. Boje asked defendant if he understood, and defendant said that he did understand the advice of rights. Boje then read to defendant the waiver of rights portion of the form and asked if defendant was willing to speak with him at that time. Defendant indicated verbally that he understood the waiver of rights and said he did wish to speak to Boje. Boje testified he made no threats or promises to the defendant, did not use force, the defendant was oriented, his answers were responsive, he appeared coherent and his agreement to speak appeared to be voluntary. (21:6-23:9).

After *Miranda* warnings were given and defendant agreed to speak, Boje asked defendant numerous questions about where he got the methamphetamine, what he was doing with it, when he made his last purchase, and if he was cooking methamphetamine. Defendant said he was not manufacturing methamphetamine, but he knew of people in the area who were, and he was willing to provide information on who was doing that. Boje

asked where he got the methamphetamine and what he was doing with it. He asked for the name of defendant's source and when the last purchase was made. Regarding his supplier, defendant said he obtained the methamphetamine from a black male named Scott approximately the day before. He had purchased seven grams of methamphetamine, but the methamphetamine was low quality and defendant said he intended to return it to Scott and get his money back. In response to Boje's question about how long he had been using methamphetamine, defendant said he had been using it since he was 15 years old and used about one to one and one-half grams per day. Defendant told Boje he did not manufacture it and did not want to know how to manufacture methamphetamine. Defendant denied selling methamphetamine; he told Boje he had scales[3] so he would not get ripped off when purchasing it and was using the baggies to separate "the rocks of methamphetamine into one baggie and the cut into another baggie." (23:12-24:3; 44:12-45:17; 46:9-12).

According to Boje, defendant did not ask to speak to a lawyer before continuing to speak to Boje, and did not ask for a lawyer during the Mirandized interview. Boje asked defendant if there was anything else he wanted to say, and defendant said there was not. The questioning ceased at about 12:11 a.m., and defendant was transported from the scene at about 12:25 a.m. The pickup truck was towed and an inventory completed. (24:10-25).

---

[3]Exhibit 5 indicates that a "silver, gram, digital scale" and nine other items were seized from defendant's vehicle and actually booked into evidence. These items do not appear on Exhibit 3, the State Patrol's inventory list. (54:4-15).

## II. LEGAL ANALYSIS

### A. SUPPRESSION OF STATEMENTS

Defendant argues his initial post-arrest statements were obtained in violation of *Miranda v. Arizona* and that the statements he made after being given his *Miranda* rights should be suppressed pursuant to *Missouri v. Seibert*, 124 S. Ct. 2601 (2004).

***1. Miranda.*** The protections of *Miranda v. Arizona* are triggered when a defendant is (1) in custody and (2) being interrogated. *United States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir.), *cert. denied*, 503 U.S. 1011 (1992). 'Interrogation' is 'express questioning,' or words or actions 'that the police should know are reasonably likely to elicit an incriminating response....' *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *Lawrence*, 952 F.2d at 1036...." *United States v. Hatten*, 68 F.3d 257, 261-62 (8th Cir. 1995), *cert. denied*, 516 U.S. 1150 (1996) (parallel citations omitted).

The statements complained of were made after the defendant was arrested. The record shows that the defendant was "interrogated" before being given his *Miranda* rights in the sense that Sergeant Boje asked defendant questions that he knew or should have known were likely to elicit an incriminating response. For example, Boje asked defendant about the presence of the needle and syringe in the vehicle and the plastic baggie containing the white crystalline-type substance without reading defendant his *Miranda* rights. I recommend that the motion to suppress statements be granted as to any statements which (a) are not exempted

from *Miranda*'s coverage[4] and (b) which were the result of "custodial interrogation" and (c) which were given before defendant was read his *Miranda* rights.

To the extent the defendant's motion seeks the suppression of physical evidence based on the *Miranda* violation, the failure to give a suspect *Miranda* warnings does not require the suppression of the physical fruits of the suspect's unwarned but voluntary statements. *United States v. Patane*, 542 U.S. 630 (2004). The record shows no indication of coercion or police misconduct in talking to the defendant at the time of his arrest. I find that all of defendant's statements were voluntary for purposes of applying *United States v. Patane*.

***2. Missouri v. Seibert.*** In *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601 (2004), the Court disapproved of a "question-first" interrogation technique where police deliberately fail to provide *Miranda* warnings before an initial round of questioning until they elicit a confession from the suspect and then seek to have the suspect repeat the confession in a second interview conducted after *Miranda* warnings are given. "The object of question-first

---

[4] Certain matters are not protected under *Miranda*. Routine biographical data is exempted from *Miranda*'s coverage. *See Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990); *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996). A consent to search is not an "incriminating statement" for purposes of *Miranda*. *See Cody v. Solem*, 755 F.2d 1323, 1330 (8th Cir.), *cert. denied*, 474 U.S. 833 (1985); *United States v. McClellan*, 165 F.3d 535, 544 (7th Cir.), *cert. denied*, 526 U.S. 1125 (1999); *United States v. Shlater*, 85 F.3d 1251 (7th Cir. 1996); *United States v. Henley*, 984 F.2d 1040, 1042 (9th Cir. 1993) (the mere act of consenting to a search does not incriminate a defendant, although the derivative evidence uncovered may be highly incriminating). Thus, *Miranda* warnings need not be given prior to requesting consent to search. *United States v. Newton*, 259 F.3d 964, 966-67 (8th Cir. 2001) (citing *United States v. Payne*, 119 F.3d 637, 643 (8th Cir.), *cert. denied*, 522 U.S. 987 (1997)).

is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Seibert*, 124 S. Ct. at 2610.

> The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.

*Seibert*, 124 S. Ct. at 2610. The Court further reasoned that

> when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Moran v. Burbine*, 475 U.S. 412, 424 (1986). By the same token, it would ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle.

*Id.* at 2611. In other words, a suspect who has already "revealed all" may well waive *Miranda* rights in the mistaken belief that his or her non-Mirandized statements were already admissible.

The plurality opinion in *Seibert* "described the controlling question as whether 'a reasonable person in the suspect's shoes' would have understood the *Miranda* warnings as conveying a message that the suspect retained a genuine choice about continuing to talk." *United States v. Terry*, 400 F.3d 575, 581 (8th Cir. 2005) (quoting *Seibert*, 124 S. Ct. at

2612-13). Factors relevant to that inquiry include "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first," *Seibert*, 124 S. Ct. at 2612, and whether, as happened in *Seibert*, "questioning was systematic, exhaustive, and managed with psychological skill." *Id* at 2612-13. *See also United States v. Hernandez-Hernandez*, 384 F.3d 562, 566-67 (8th Cir. 2004); *United States v. Fellers*, 397 F.3d 1090, 1098 (8th Cir. 2005), *petition for cert. filed*, May 16, 2005, No. 04-1552.

The videotape of this incident (Ex. 1) does demonstrate, after the defendant was arrested, an ongoing exchange between Sergeant Boje and the defendant. To a large extent, the commonly-cited "*Seibert* factors" technically weigh in favor of the defendant; however, the circumstances differ dramatically from those in *Seibert* in that the record in this case does not even begin to reveal "a police strategy adapted to undermine the *Miranda* warnings" or show that the non-Mirandized questioning "was systematic, exhaustive, and managed with psychological skill."

In *Seibert*, the investigating officer freely admitted he "made a 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once.'" 124 S. Ct. at 2606. In the case at bar, the record

suggests that Boje was engaged in other activities as he talked to the defendant and, at some point, realized it would be prudent to advise defendant of his *Miranda* rights. Based on the results of the vehicle search, Boje would have had a basis for the questions asked during the Mirandized portion of the interview even without the benefit of defendant's un-Mirandized statements. *Cf. United States v. Fellers*, 397 F.3d at 1096.

The *Seibert* decision was meant to curb "[s]trategists dedicated to draining the substance out of *Miranda*." *See* 124 S. Ct. at 2613. The gist of the Court's ruling is to ensure that suspects are effectively advised that they have a genuine right to remain silent. *See* 124 S. Ct. at 2611. Under the circumstances of this incident, I find, as did the courts in *United States v. Fellers* and *United States v. Terry*, that a reasonable person in the defendant's shoes would have understood the *Miranda* warnings he was given as conveying a message that he retained a genuine choice about continuing to talk to Sergeant Boje.

***3. Waiver of Miranda Rights.*** The government bears the burden of proving the validity of a *Miranda* waiver by a preponderance of the evidence. *United States v. Haggard*, 368 F.3d 1020, 1024 (8th Cir. 2004) (citing *Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986)).

> A waiver of the Fifth Amendment privilege against self incrimination is valid only if it is made voluntarily, knowingly, and intelligently. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). A waiver is knowing if it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986). It is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.*

*United States v. Syslo*, 303 F.3d 860, 865 (8th Cir. 2002). To determine whether a waiver was voluntary, the court considers the totality of the circumstances and must determine whether the individual's will was overborne. *United States v. Syslo*, 303 F.3d at 866; *United States v. Holloway,* 128 F.3d 1254, 1256 (8th Cir. 1997).

The defendant in this case had prior experience with law enforcement. He had the presence of mind to close the windows, lock his pickup truck, and to call friends for assistance after his vehicle was stopped. There is no evidence that defendant was forced or coerced into talking to Boje and there is no evidence suggesting that defendant's will was overborne.

I find that defendant did, in fact, voluntarily waive his *Miranda* rights and recommend that the motion to suppress be denied as to defendant's Mirandized statements.

### B. LEGALITY OF VEHICLE SEARCH

The government argues that the search of defendant's vehicle without a warrant was permissible for several reasons.

*1. Consent.* "Police may conduct a search of someone's home or person even without a warrant or probable cause if that person voluntarily consents to the search. *See United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990)." *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000); *see also United States v. Deanda*, 73 F.3d 825 (8th Cir. 1996). To determine whether such a consent was voluntary, the court must examine the totality of the circumstances, including the characteristics of the accused and the nature of the encounter.

*See Bradley*, 234 F.3d at 366. The government has the burden of proving consent was voluntary. *United States v. Parris*, 17 F.3d 227, 229 (8th Cir.), *cert. denied*, 511 U.S. 1077 (1994); *United States v. Heath*, 58 F.3d 1271, 1275 (8th Cir.), *cert. denied*, 516 U.S. 892 (1995). "The prosecution need not prove that the individual was fully aware of his or her rights under the Fourth Amendment in order to establish a voluntary consent." *Heath*, 58 F.3d at 1275 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 235 (1973)). "Consent is voluntary 'if it was the product of an essentially free and unconstrained choice by its maker, rather than the product of duress or coercion, express or implied.'" *United States v. Fleck*, ___ F.3d ___, 2005 WL 1522738 (8th Cir., June 29, 2005) (quoting *Chaidez*, 906 F.2d at 380).

The conversation between Sergeant Boje and the defendant was recorded on videotape. The court has reviewed the videotape (Ex. 1), which generally corroborates Boje's testimony and shows a verbal consent to search by the defendant. The consent was not limited in any fashion and was not retracted. Considering the *Chaidez* factors[5] in conjunction

---

[5]Courts in the Eighth Circuit generally consider the "*Chaidez* factors" to determine if consent was voluntary:

"Characteristics of persons giving consent" which may be relevant to the question include: (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.

*Id*. at 381 (internal citations omitted). Characteristics of "the environment in which consent was given" include:

whether the person who consented (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred.

with the videotape, and the hearing testimony, I find that defendant voluntarily consented to the search of his vehicle.

**2. Search Incident to Arrest.** Under *New York v. Belton*, 453 U.S. 454, 460 (1981), "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." "[T]he police may also examine the contents of any containers found within the passenger compartment, for if the passenger compartment is within reach of the arrestee, so also will containers in it be within his reach." *Id*. *See also United States v. Wells*, 347 F.3d 280 (8th Cir. 2003), *cert. denied*, 541 U.S. 1081 (2004); *United States v. Orozco-Castillo*, 404 F.3d 1101 (8th Cir. 2005).

In this case, the vehicle search began within 10 minutes of defendant's arrest and was conducted at the scene of the arrest. I find that the search of the cab was "contemporaneous to the arrest," *see United States v. Wells*, 347 F.3d at 287, and was permissible under *New York v. Belton*.

**3. Automobile Exception.** The "automobile exception" to the warrant requirement authorizes officers to search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity. *United States v. Hill*, 386 F.3d

---

*Id*. (internal citations omitted). The factors should not be applied mechanically, *id*., and no single factor is dispositive or controlling. *United States v. Ponce*, 8 F.3d 989, 997 (5th Cir.1993).
*United States v. Bradley*, 234 F.3d at 366.

855, 858 (8th Cir. 2004). "'If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth amendment ... permits police to search the vehicle without more.'" *Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)).

In this case, the state troopers began searching the vehicle with the defendant's consent and incident to his arrest. They found a needle and syringe, and a quantity of suspected methamphetamine, providing probable cause to search the entire vehicle.

***4. Inventory Search.*** The defendant could not lawfully drive his vehicle away from the scene and the vehicle could not be released to a third party in light of the contraband found inside the vehicle. Thus, the officers took steps to impound the pickup in accordance with the Nebraska State Patrol's policy and procedures governing traffic auxiliary services (Ex. 4, § VIII ("Inventory and Storing of Vehicles")). In this context, the inventory search of the defendants' vehicle appears to be permissible under *United States v. Wallace*, 102 F.3d 346, 348 (8th Cir. 1996):

> It is well established that "[t]he police are not precluded from conducting inventory searches when they lawfully impound the vehicle of an individual that they also happen to suspect is involved in illegal activity." *United States v. Marshall*, 986 F.2d 1171, 1175-76 (8th Cir. 1993). In other words, "[a]s long as impoundment pursuant to the community caretaking [or public safety] function is not a mere subterfuge for investigation, the coexistence of investigatory and caretaking [or public safety] motives will not invalidate the search." *Id*. at 1176 (quoting *United States v. Rodriguez-Morales,* 929 F.2d 780, 787 (1st Cir. 1991), *cert. denied*, 502 U.S. 1030 (1992)). In *Colorado v. Bertine*, 479 U.S. 367, 374 (1987), the Supreme Court held that "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment."

(Parallel citations omitted). Later, in *United States v. Mayfield*, 161 F.3d 1143, 1145 (8th Cir. 1998), *cert. denied*, 526 U.S. 1045 (1999), the Eighth Circuit stated:

> After lawfully taking custody of an automobile, police may search the automobile without a warrant to produce an inventory of the automobile's contents. *See South Dakota v. Opperman*, 428 U.S. 364, 376 (1976). The intrusion is justified by governmental interests in protecting the owner's property while it remains in police custody, in protecting the police against claims or disputes over lost or stolen property, and in protecting the police from potential danger. *See id*. at 369. The Fourth Amendment is not offended if, considering the totality of the circumstances, the inventory search is reasonable. *See id*. at 373. Inventory searches are reasonable when they are conducted according to standardized police procedures. *See id*. at 372; *see also Colorado v. Bertine*, 479 U.S. 367, 374 (1987). Compliance with procedures merely tends to ensure the intrusion is limited to carrying out the government's caretaking function. *See Opperman*, 428 U.S. at 374-75. This does not mean that inventory searches are always unreasonable when standard procedures are not followed, however. *See United States v. Woolbright*, 831 F.2d 1390, 1394 (8th Cir. 1987) (failure of police to complete inventory of arrestee's belongings as policy provided after finding drugs in arrestee's suitcase did not render inventory search unreasonable where police changed plans and decided to transfer arrestee to federal authorities); *United States v. Trullo,* 790 F.2d 205, 206 (1st Cir. 1986); *see also Whren v. United States*, 517 U.S. 806, 816 (1996) (although adherence to procedures shows lack of pretext, deviation from procedures does not prove pretext).

(Parallel citations omitted).

> Finally, the Court in *South Dakota v. Opperman* long ago acknowledged that
>
> [t]he authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.
>
> When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents. These procedures developed in response to three distinct needs: the protection of the owner's property while it remains in police custody, ... the

> protection of the police against claims or disputes over lost or stolen property, ... and the protection of the police from potential danger....

428 U.S. at 369 (citations omitted). The Court also observed that it "has consistently sustained police intrusions into automobiles impounded or otherwise in lawful police custody where the process is aimed at securing or protecting the car and its contents." *Id.* at 373.

I find Sergeant Boje's testimony to be credible. The State Patrol's policy requires that an inventory be completed at the time of impoundment. Examining the "totality of the circumstances" surrounding the decision to impound and conduct an inventory search of defendant's vehicle, *see United States v. Mayfield*, I conclude this search was reasonable under the Fourth Amendment.

## III.  RECOMMENDATION

In summary, defendant was in custody when subjected to questioning, words, or actions that the police should have known were reasonably likely to elicit an incriminating response. His pre-Mirandized statements, therefore, should be suppressed. His Mirandized statements should not be suppressed pursuant to *Missouri v. Seibert* because a reasonable person in defendant's position would have understood, after being given *Miranda* warnings, that he retained a genuine choice about continuing to talk to Sergeant Boje. The search of defendant's pickup truck occurred with defendant's consent and pursuant to his arrest. The search also falls within the scope of the automobile exception to the warrant requirement and is justifiable as an inventory search.

For these reasons,

**IT IS RECOMMENDED** that the Motion to Suppress Evidence (#20) be granted as to defendant's non-Mirandized statements and denied in all other respects.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED July 5, 2005.**

        **BY THE COURT:**

        **s/ F.A. Gossett**
        **United States Magistrate Judge**